UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
                                          ┌─────────────────────────────┐
                                          │          FILED              │
                                          │   ┌─────────────────────┐   │
                                          │   │    JUN - 8 2018      │   │
                                          │   └─────────────────────┘   │
                                          │  CLERK, U.S. DISTRICT COURT  │
                                          │        NORFOLK, VA           │
                                          └─────────────────────────────┘
```

ELIZABETH PITTARD,

      Plaintiff,

v.                                  ACTION NO. 2:17cv71

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Elizabeth Pittard ("Pittard") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Pittard's motion for summary judgment (ECF No. 14) be DENIED and that the Commissioner's motion for summary judgment (ECF No. 16) be GRANTED.

# I.  **PROCEDURAL BACKGROUND**

Plaintiff, Elizabeth Pittard, protectively filed an application for disability insurance benefits on July 6, 2012, alleging that she became disabled on February 1, 2011, due to severe depression, asthma, severe anxiety, scoliosis, and chronic pain.[1]  R. 155–59, 167–71.  Following the state agency's denial of these claims, both initially and upon reconsideration, Pittard requested a hearing before an Administrative Law Judge ("ALJ").  R. 5–9, 68, 83.  ALJ William T. Vest, Jr., heard the matter on June 23, 2015, and issued a decision denying benefits on July 14, 2015.  R. 10–28, 30–55.

On November 29, 2016, the Appeals Council denied Pittard's request for review of the ALJ's decision.  R. 1–4.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted all administrative remedies, Pittard filed a complaint with this Court on March 20, 2017, ECF No. 3, which the Commissioner answered on June 5, 2017, ECF No. 8.  In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on August 8, 2017 and September 7, 2017, respectively, and Pittard replied on September 28, 2017.  ECF Nos. 14–18.  As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

# II.  **RELEVANT FACTUAL BACKGROUND**

## A.    *Background Information and Hearing Testimony by Elizabeth Pittard*

Born in 1961, Pittard was 50 years old as of the onset date of disability of February 1,

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

2011. R. 33. After completing high school, and earning her degree as a registered nurse, R. 33, 172, Pittard worked as a registered nurse, a workers' compensation case manager, and a nurse case manager. R. 33, 36, 172, 179. Pittard reported working as a nurse case manager from 2005 to February 2011, during which she "sat at a computer and took phone calls." R. 179–80. She described walking and standing for less than one hour in an eight-hour day, and lifting less than ten pounds, while sitting, reaching, and typing for eight hours. R. 180. She testified that she stopped working in February 2011 when her mother became ill. R. 33.[2]

In an adult function report dated September 1, 2012, R. 187–94, Pittard noted that she could no longer concentrate, be in public, or stand and sit without pain, and that she was always tired and slept a lot but did not feel rested. R. 188. She reported mowing the lawn on a tractor for two hours two times each month, doing two hours of laundry each week, and performing light chores daily. R. 189. Pittard indicated that she liked to go outside every day, as long as the weather permitted and her asthma was not bad. R. 190. She drove a car, and shopped for food and clothes two times a month for two to three hours. *Id.* She reported that she could pay bills, count change, handle a savings account, and use a checkbook. *Id.* Her hobbies included reading and watching television daily, camping twice each year, and riding a motorcycle. R. 191. She described spending time with others daily or weekly at bible study, church service, and when visiting neighbors, but indicated that she would rather not be in public places. R. 191–92. With regard to her abilities, Pittard indicated that she could lift eight pounds, walk one block, sit for fifteen minutes, stand for three minutes, and climb half of a flight of stairs. R. 192. Her symptoms affected her ability to squat, bend, reach overhead, complete tasks, and concentrate.

---

[2] In a disability report filled out pursuant to a phone interview conducted when Pittard applied for benefits, she indicated that she stopped working "because of [her] condition." R. 171.

3

*Id.*   She reported that she would need to rest for ninety seconds after walking one block, she could concentrate for thirty minutes, she could follow spoken or written instructions well, and she could get along with authority figures well.  R. 192–93.  She reported easily becoming anxious when under stress, and taking time to adjust to new routines.  R. 193.  Pittard indicated that she had used a cane or walking stick on and off since the mid-1990s.  *Id.*

In connection with the appeal of the initial disability decision, Pittard completed a disability report on June 18, 2013.  R. 197–203.   She reported experiencing severe pain in her spine and tailbone, difficulty breathing, and severe panic attacks.  R. 201–02.  As a result of these symptoms, she needed assistance with bathing, such as needing to use a shower bench, was too tired to do yard work or all of her laundry without help, lacked ambition, did not want to do anything, and needed help from her roommate to perform daily activities.  R. 201–03.

On August 18, 2013, Pittard reported that she could no longer travel, hike, or camp.  R. 208, 211.  She reported that she read, watched television, watched her church service online on Sundays, listened to music, and talked to her neighbors at least once each week.  R. 208.  She indicated that she could concentrate for fifteen minutes, carry eight pounds, and walk one block (with a walking stick) before needing to rest for five minutes.  R. 209–10.  She could follow written and spoken instructions very well, but she did not finish what she started, could not handle stress or changes in routine well, and had anxiety attacks.  *Id.*  She reported going outside everyday if the weather permitted, and driving half of the time and riding in the car half of the time.  R. 207.  She reported no difficulty with handling money and paying bills.  *Id.*

At the time of the hearing before the ALJ on June 23, 2015, Pittard lived with a housemate.  R. 37.  Pittard testified that her daily activities included playing solitaire on her

4

tablet, watching television, and taking care of her dog and her housemate's two dogs by feeding them and letting them outside. R. 38, 41, 188. She testified that she cooked simple meals by microwaving meals or heating soup. R. 39. She went to the store a few times each year, but did not like being around people. R. 39, 50.

Pittard testified that she had pain from scoliosis, which she rated a five out of ten after taking Tylenol. R. 40, 43. She testified that she did not want to take pain medicine, because that is "a slippery slope." R. 40. She testified that she could lift ten pounds occasionally, sit for ten to fifteen minutes, and "probably" walk for a block. R. 41, 46–47. Pittard testified that she had stopped cutting the grass with a tractor the previous year. R. 44.

Beginning in 2012, Pittard received treatment for depression and anxiety from Dr. Feldman, who prescribed Prozac. R. 41, 47–48. She testified that later, due to an inability to pay, she had not received counseling for the previous year. R. 47–48. Pittard testified that, even with medication, she experienced anxiety and had panic attacks every two weeks that lasted for twenty minutes. R. 48–49. She cried daily and had difficulty sleeping. R. 49–50. Pittard testified that she previously had issues with alcohol abuse, and drank daily prior to quitting in 2012. R. 50–51. Pittard listed her medications as Tylenol for pain, Zyrtec and Nasacort for allergies, Albuterol for asthma and chronic obstructive pulmonary disease ("COPD"), and Prozac and Zantac for depression and anxiety. R. 40.

**B.**    ***Relevant Medical Evidence***

      **1.**    **Treatment Records from Sentara Family Physicians**

Pittard's treatment records from Sentara Family Physicians, dated February 2010 through May 2011, indicate that she was treated for back pain, hypertension, asthma, depression, and

anxiety. R. 295–334. Pittard started complaining of back pain in August 2010. R. 316–17. Harry T. Williams, M.D., treated Pittard at Sentara Urgent Care on January 15, 2011. R. 326–28. Pittard reported that she felt well overall, had chronic, mild low back pain that was "tolerable," and that her asthma was gradually improving. R. 327. She reported that depression had been a chronic problem, and that her current episode had started more than one week prior to the visit and was gradually improving. *Id.* Pittard's physical examination was normal, with the exception of a rare wheeze, "with excellent air [movement]." R. 327–28. Dr. Williams found Pittard alert and oriented with normal mood, memory, affect, and judgment. R. 328. He noted that Pittard had resumed smoking, ordered a pneumonia vaccine, and prescribed omeprazole (Prilosec). R. 326–27.

Pittard returned to Dr. Williams on May 13, 2011, reporting that she felt "very well," had asthma and gastroesophageal reflux disease ("GERD") under full control, and that her mood symptoms were doing well off medication. R. 330. Pittard had a normal examination, was "negative for depression," and was not nervous or anxious. *Id.*

### 2. Progress Notes from Christian Psychotherapy Service

Pittard attended approximately three therapy sessions per month with Elizabeth Lawrence, LPC, at Christian Psychotherapy Service from August 2010 through July 2011, one session per month from August 2011 through August 2012, and one session in March 2014. R. 335–65, 393–95. In August 2010, Pittard reported that she had suffered from depression in the 1980s, in her mid-20s, and was taking Xanax to help with her anger. R. 365. She enjoyed her job, but was frustrated with her boss who would not listen to her. *Id.* She reported mild insomnia and chronic pain. *Id.*

6

In September 2010, Pittard shared that she was addicted to alcohol, and that she had abused alcohol, blacked out, and missed one day of work. R. 363. She began a twelve-step program, and had gone three weeks without alcohol by the end of the month. R. 362–64. Pittard reported low self-esteem and that she hated living by herself. R. 362–63. Counselor Lawrence assigned a GAF of 60. R. 363. Pittard purchased a motorcycle and attended a recreation center for exercise. R. 364.

In October and November 2010, Pittard reported varying degrees of work stress and anxiety, frustration with her boss, negative feelings about her mother, low self-esteem, sleep disturbance, depression, and an inability to concentrate. R. 356–61. She continued attending AA meetings, and quit smoking. R. 356, 359. She managed stress by walking and attending group therapy sessions, reading, and journaling. *Id.* Counselor Lawrence advised that Pittard's doctor should increase her Prozac dosage from 20 to 40 mg. R. 358.

In December 2010, while Pittard continued to experience pain, she reported feeling better about herself, interacting more, being positive, having less anxiety, and that work was "going well." R. 354–55. She reported that her mother was declining cognitively, and that she was detaching from her mother's negativity. R. 355.

In January 2011, Pittard was written up at work for confronting her boss. R. 353. Pittard reported frustration, anger, and feelings of worthlessness triggered by her boss. *Id.*

In February 2011, Pittard's mother went into the hospital for congestive heart failure and pneumonia. R. 351. Pittard took leave from work, and cared for her mother "24/7." *Id.* Pittard reported that she was able to sleep, was less stressed, and had positive feelings about herself, her relationship with her mother, and her situation. R. 350–51. Counselor Lawrence noted that she

7

had made excellent progress, and reported a GAF of 64–65. *Id.*[3] Pittard discussed the possibility of quitting work and moving in with her mother, and indicated she was researching the cost of hiring a nurse for her mother. *Id.*

In March 2011, Pittard reported less anxiety, less depression, improved self-esteem, and a stable mood. R. 348–49. She had started helping someone with their paper route, felt good about helping, and had a good routine to start the day. R. 349. Pittard was considering taking a leave of absence, which had been approved, but was concerned that her job may not be available when the leave period ended. R. 348. Counselor Lawrence assigned a GAF of 67–72. R. 379.

In April and May 2011, Pittard reported that she was doing well in relationships, and was able to be positive about this opportunity to care for her mother. R. 345–46. Although her mood was stable, Pittard reported anxiety, depression, exhaustion, and back pain. *Id.* Counselor Lawrence assigned a GAF of 68. R. 346–47.

Pittard's mother passed away in June 2011. R. 345. In June and July 2011, Pittard reported sleeping a lot, aimlessness, and a combination of grief, relief, and sadness. R. 344–45. She believed that she would work in a "non-traditional job," and she sensed that "God has more

---

[3] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and indicates an overall assessment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR), 34 (4th ed. 2000). The following ranges are linked to the following symptomology: (1) 91–100—no symptoms, superior functioning; (2) 81–90—absent or minimal symptoms, good functioning; (3) 71–80—transient symptoms, no more than slight impairment in functioning; (4) 61–70—some mild symptoms, generally functioning pretty well; (5) 51–60—moderate symptoms and moderate functional difficulties; (6) 41–50—serious symptoms and serious functional impairments; and (7) 31–40—"some impairment in reality testing or communication ... and major impairment in several areas" of functioning. *Id.* The DSM-V abandoned the use of GAF scores as a diagnostic tool for characterizing patient functioning due to the questionable probative value of the scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

for her." R. 344. She continued to deliver papers, was processing the events surrounding her mother's death, and had plans for the next few weeks. R. 344–45.

In July and August 2011, Pittard was grieving and feeling down, forgetful, frustrated, and angry. R. 342–43. Pittard got baptized and indicated that she was able to share her beliefs and her faith. *Id.*

At the beginning of September 2011, Pittard was positive and confident, without anxiety. R. 342. She was "very busy [doing] yard work" and nursing her cancer surviving friend, which she enjoyed. *Id.*

In late September and October 2011, Pittard was feeling a little down and lonely while trying to remain positive. R. 341. She was suffering from back, hip, and leg pain, was sleeping to avoid the pain, and was thinking of filing for disability. *Id.*

In November 2011, Pittard reported seeing a chiropractor for her scoliosis and shoulder pain. R. 340. She was getting plenty of sleep, but could not sit or stand for more than fifteen minutes. *Id.* She was pleased to have a friend visiting, but had to do chores in stages and found it a challenge to clean the house. *Id.* She received help with laundry and making the bed. *Id.*

In December 2011 and January 2012, Pittard reported sadness and crying spells, a distrust of others, and defensiveness. R. 338–39.

In February 2012, Pittard reported that "things are going well," and that she had no symptoms of depression, anxiety, or grief on the anniversary of her mother's death. R. 338.

In March 2012, she reported mild depression, grief, anger, no appetite and defensiveness, although she was sleeping better. R. 337. Counselor Lawrence advised Pittard to get back on her medication. *Id.*

9

In May 2012, Pittard reported that she had gotten a roommate, that she was not worrying, did not have an urge to drink, and that she felt good. *Id.* Her aunt had fallen and broken her shoulder, and Pittard was considering going to help her recover. *Id.*

Pittard cried during her therapy session in August 2012. R. 336. She reported that she was depressed, had low self-esteem, was unmotivated and in bed a lot, was unable to take care of her environment, and that her house was a mess. *Id.*

Pittard returned for a therapy session with Counselor Lawrence almost two years later in March 2014. R. 393–95. Pittard described depression, anxiety, asthma, lethargy, and feelings of worthlessness. R. 393. She reported that she was unemployed, could not lift at all or stand for any length of time, and could not lean over to clean. *Id.* She showered once per week, and drove a few blocks daily, but no longer attended church because services were held in a high school and she could not sit in the chairs. *Id.* She could not afford her asthma medication. *Id.* Counselor Lawrence observed that Pittard had normal attention, concentration, and memory. R. 393–94. With respect to intelligence, Pittard was bright with fair judgment and normal insight, however, she did exhibit a sad expression and blunt affect. R. 394. Under "Problem List," Counselor Lawrence listed alcohol, anger, anxiety, depression, disability, irritability, self-esteem, shame, and stress. *Id.* Counselor Lawrence recommended individual therapy, and that Pittard stop alcohol use. *Id.*

### 3. Dr. Feldman's Treatment Notes and Assessment

Pittard began treatment with Howard R. Feldman, M.D., on August 28, 2012, and had seven appointments with the last treatment note dated May 26, 2015. R. 366–74, 387–92, 396–406. On August 28, 2012, she reported suffering from asthma, kidney disease, COPD, high

10

blood pressure "at times," depression for two years, and back pain. R. 368. Pittard reported having two drinks per day. *Id.* She also reported smoking one pack of cigarettes per day for the previous thirty years. *Id.* Dr. Feldman noted that Pittard had back surgery when she was fifteen years old. *Id.* Her medications were Prozac, Claritin, Flonase, Flovent, Combivent, Albuterol, Zantac, Mucinex, and Aleve. *Id*

An x-ray of Pittard's lumbar spine, taken March 11, 2013, revealed "[p]ronounced leftward scoliosis with marked spondylosis and probable multilevel disc degeneration." R. 375.

Dr. Feldman examined Pittard in June 2013, and had blood drawn and tested. R. 388–92. He noted that Pittard's depression and anxiety were the same, she had lower back pain from scoliosis and was unable to lift. R. 388. The only abnormal or remarkable finding listed in the physical examination notes is a discussion about her wheezing. R. 392. Dr. Feldman instructed Pittard to use albuterol as needed, to continue using Tylenol, and to stop smoking. R. 392

Dr. Feldman treated Pittard on March 6, 2014 for chronic depression and chronic pain syndrome, noting Pittard's report of pain in her back, feet, and shoulder blades. R. 414.

Dr. Feldman treated Pittard over one year later on March 31, 2015. R. 412. Pittard described chronic left shoulder pain and pain between her shoulder blades. *Id.* She reported only being able to sit for twelve to fifteen minutes. *Id.* When Pittard returned on April 8, 2015, Dr. Feldman noted a deep cough but clear lungs. R. 408.

Dr. Feldman completed a physical RFC form on April 8, 2015. R. 396–401. He noted Pittard has scoliosis and had back surgery in 1976 to fuse T10 to L4. R. 396. She performed work at a desk until 2011 with symptoms of pain and depression, and needed to move every ten minutes. *Id.* Pittard reported progressive pain in her lumbosacral spine, thoracic spine,

11

shoulders, and hips. *Id.* Dr. Feldman opined that Pittard could walk less than one block without rest, could sit for ten minutes before needing to get up, could not stand still, and needed to move every five to ten minutes. R. 398. He assessed that Pittard could rarely lift ten pounds or climb stairs; occasionally raise arms above her shoulders; and never lift twenty pounds, twist, stoop, bend, crouch, and climb ladders. R. 400. She had no tolerance for cold or work from heights, and had no manipulative limitations. *Id.* He found that Pittard was not a malingerer and that her emotional impairments contributed to her symptoms. R. 397. He noted that Pittard had no prescribed medicine, but would be starting antidepressants. R. 398, 401. Dr. Feldman opined that Pittard's symptoms were severe enough to frequently interfere with her attention and concentration, that she would be absent more than three days per month, and that she was incapable of even low stress work. R. 397, 401.

Dr. Feldman also completed a mental RFC form on April 8, 2015. R. 402–05. He noted that Pittard had depression in the mid-1990s and that she stopped drinking alcohol in 2012. R. 402–03. Dr. Feldman checked blanks to indicate that Pittard's symptoms included: loss of interest, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, generalized persistent anxiety, apprehensive expectation, and recurrent severe panic attacks. R. 402. Dr. Feldman noted that Pittard was not working, and that thinking about doing so "frightens her greatly." R. 403. On another chart, Dr. Feldman checked boxes to indicate that Pittard was extremely impaired in two areas: (1) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (2) the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable

12

number and length of rest periods.  R. 404.  Dr. Feldman found Pittard markedly impaired in two

areas:  (1) her ability to maintain attention and concentration for extended periods, and (2) ability

to travel in unfamiliar places or use public transportation.  R. 404–05.  He indicated that Pittard

was moderately impaired in five areas:  (1) the ability to understand and remember detailed

instructions, (2) her ability to carry out detailed instructions, (3) her ability to work in

coordination with and proximity with others without being distracted by them, (4) her ability to

interact appropriately with the general public, and (5) her ability to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes.  *Id.*  He found Pittard was not

significantly impaired in eleven areas.  *Id.*

On April 27, 2015, Pittard reported feeling down all the time and being depressed.  R.

407. Dr. Feldman discussed her medications, Klonopin for anxiety and Prozac.  *Id.*

Dr. Feldman's treatment notes from May 26, 2015 indicate Pittard felt that the Prozac

was starting to help, and that she was not as down but was still anxious.  R. 406.

### 4.    Consultative Examinations

On March 6, 2013, Richard Shea, Ph.D., performed a consultative examination of Pittard.

R. 376–82.  In his report, completed March 11, 2013, Dr. Shea noted Pittard's history of

depression beginning in the 1980s or 1990s, which had been treated with medication and

therapy.  R. 377, 380.  Pittard reported that the medication and therapy were helpful, and that she

was worse without the medications.  R. 379.  Pittard denied any psychiatric hospitalization, and

explained that she was not currently attending therapy due to her financial situation.  *Id.*  Pittard

described her work history, problems keeping up her productivity and being anxious at work, and

quitting work to care for her mother.  R. 378.  She explained that she was not currently working

13

due to pain and energy issues. *Id.*

Pittard described daily activities of "normal household stuff," such as making sure she eats, taking care of the dog, doing laundry, and paying bills. *Id.* While she was no longer social, she retained friends from a very old neighborhood and two close people from her church. *Id.* She reported not being able to complete tasks because she gets tired and distracted. *Id.*

Regarding Pittard's mental status examination, Dr. Shea found she was calm, adequately dressed and groomed, alert and oriented, with clear speech, and goal-directed responses to questions. R. 379. Pittard denied phobias or ever having suicidal ideations or hallucinations, but reported anxiety and panic attacks. *Id.* She exhibited a depressed and anxious mood and affect, and reported restless sleep, decreased appetite, little to no energy, and pain. *Id.* Dr. Shea assessed her cognitive function as average with intact judgment and insight. *Id.*

Dr. Shea diagnosed Pittard with major depression and generalized anxiety disorder with panic and anxiety attacks, and assigned a GAF of 55 to 60. R. 380. Dr. Shea opined that Pittard was capable of medium level tasks, and that her ability to attend work regularly and work consistently and her ability to work a full week was going to be impacted by both health issues as well as her unstabilized psychiatric conditions. *Id.* Her ability to interact with coworkers and the general public was going to be impacted by her social isolation. R. 380, 382. Her ability to handle reasonable job stress was significantly hampered by the psychiatric conditions, which were not stabilized in spite of the ongoing treatment over the years. R. 382. Dr. Shea found Pittard to be credible and his prognosis was guarded. R. 380.

Sarbjot S. Dulai, M.D., performed a physical consultative examination of Pittard on March 15, 2013. R. 383–86. Dr. Dulai noted that Pittard could do all activities of daily living.

14

R. 384. Pittard's physical examination was normal with the exception of a "somewhat antalgic" gait and difficulty with a tandem gait. *Id.* Pittard exhibited normal tone and bulk, 5/5 strength in the upper extremities, "give-way weakness" in the lower extremities with normal strength when full effort is given. R. 385.

Dr. Dulai diagnosed back pain, asthma, a history of scoliosis post fusion from T10 to L4, and depression/anxiety. *Id.* He assessed that Pittard could stand and walk six hours in a workday with no limitations on sitting; may require an assistive device for prolonged distance and uneven terrain; and has frequent postural limitations with bending, crouching and stooping due to her back pain, spinal fusion and mild gait instability. *Id.* Dr. Dulai found that Pittard could lift ten pounds frequently and twenty pounds occasionally, and had a normal range of motion. R. 385–86.

### 5.    State Agency Consultants

On March 21, 2013, and December 4, 2013, Julie Jennings, Ph.D., a state agency physician, reviewed Pittard's medical records and completed a mental RFC assessment. R. 60–61, 63–65, 75, 78–80. Dr. Jennings assessed that Pittard's affective disorders caused mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. R. 61, 75. Dr. Jennings opined that Pittard was moderately limited in her ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) interact appropriately with the general public. R. 64,

78–79.  Dr. Jennings advised that Pittard should be limited to simple, unskilled, non-stressful work.  R. 65, 79.

Robert Keeley, M.D., a state agency physician, reviewed Pittard's record on March 22, 2013 and made a physical RFC assessment.  R. 61–63, 65–67.  Dr. Keeley opined that Pittard: (1) could only occasionally lift twenty pounds and frequently lift ten pounds; (2) could stand and/or walk about six hours in an eight-hour workday and sit for the same time period; (3) had an unlimited ability to push and/or pull, subject to the weight totals noted above; (4) had postural limitations stemming from her history of scoliosis with marked spondylosis that limited her to only occasionally climbing ladders, ropes, and scaffolds, stooping, kneeling, crouching, and crawling; and (5) had no manipulative, visual, communicative, or environmental limitations.  R. 62–63.

Joseph Duckwall, M.D., another state agency physician, reviewed Pittard's record on December 9, 2013.  R. 76–78.  Dr. Duckwall agreed with Dr. Keeley's RFC assessment adding only that Pittard should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards.  *Id.*

## C.   *Hearing Testimony of Vocational Expert - Robin Stromberg*

At the hearing before the ALJ, Robin Stromberg, a vocational expert ("VE"), responded to the ALJ's hypothetical questions concerning the availability of jobs for a person of Pittard's age, education, and past work experience, who is capable of light work, but limited to carrying ten pounds frequently and twenty pounds occasionally, who can sit for eight hours and walk or stand for four hours and should be allowed to alternate sitting and standing at least each thirty minutes, no climbing or crawling, only occasionally stooping or squatting, no exposure to

16

excessive amounts of dust, smoke or other air pollutants, and only simple, repetitive job tasks. R. 52–53. VE Stromberg testified that jobs in the light and unskilled level of work existed in the national economy for a person having such a profile in the occupations of general information clerk, office helper, and cashier. R. 53. VE Stromberg testified regarding the opportunity to alternate sitting and standing based on her experiences as a vocational expert. *Id.*

VE Stromberg also testified that, if the same hypothetical person was subject to the additional limitation of being off-task up to a third of the day, no employment would exist. R. 54.

### III. **THE ALJ's DECISION**

To evaluate Pittard's claim of disability,[4] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether Pittard: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 15–23.

---

[4] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

The ALJ found that Pittard met the insured requirements[5] of the Social Security Act through December 31, 2016, and she had not engaged in substantial gainful activity since February 1, 2011, her alleged onset date of disability. R. 15.

At steps two and three, the ALJ found that Pittard had the following severe impairments: (a) degenerative disc disease; (b) scoliosis; (c) depression; (d) anxiety; and (e) asthma by history. R. 15–16. The ALJ classified any additional impairment—specifically hypertension, GERD, and alcohol abuse—as non-severe, because they did not exist for a continuous period of twelve months, responded to medication, required no significant medical treatment, or did not otherwise continuously impose functional limitations upon her. *Id.* The ALJ further determined that Pittard's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 16–17.

The ALJ next found that Pittard possessed the RFC to perform "less than a full range of light work," *see* 20 C.F.R. § 404.1567(b), with the limitations that she: (a) can "lift and carry ten pounds frequently and twenty pounds occasionally"; (b) can "sit for eight hours," and "stand or walk for four hours in an eight-hour workday with a sit/stand option every thirty minutes for comfort"; (c) cannot climb or crawl; (d) can only occasionally stoop or squat; (e) can have no "exposure to excessive amounts of dust, smoke, or other air pollutants"; and (f) "is limited to simple, repetitive job tasks." R. 17–21. Based upon this RFC assessment, the ALJ determined at

---

[5] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

step four that Pittard could not return to her past relevant work as a case manager and floor nurse. R. 21.

Finally, at step five, and after considering her age, high school education, work experience, and RFC, the ALJ found that Pittard could perform other jobs, such as a general information clerk, office helper, and cashier, which existed in significant numbers in the national economy. R. 22. Accordingly, the ALJ concluded that Pittard was not disabled from February 1, 2011 through the date of the ALJ's decision and was ineligible for a period of disability or DIB. R. 23.

## IV. **STANDARD OF REVIEW**

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence

19

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).   The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).   Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V. ANALYSIS

### A.     *The ALJ did not err in evaluating Pittard's RFC, which falls between the light and sedentary exertional levels.*

Pittard asserts that the ALJ erred, after finding Pittard was capable of "less than a full range of light work,"  in failing to make a finding as to whether the "limitations set forth in the RFC resulted in the light exertional capacity being 'significantly reduced  in terms of the regulatory definition.'"    ECF No. 15 at 4–5 (citing SSR 83-12, 1983 WL 31253 (S.S.A.)). Pittard argues that her RFC falls between the two exertional levels of light and sedentary, because she was limited to standing or walking for four hours in an eight-hour workday with a "sit/stand option" every thirty minutes. *Id.* at 5. Pittard notes that, if her RFC were classified as sedentary, the grid rules would direct a finding of disabled due to her age category—"closely approaching advanced age," education—"high school graduate or more—does not provide for direct entry into skilled work," and previous work experience—"skilled  or semiskilled—skills not transferable" (based on the RFC limitation of only simple, repetitive job tasks). *Id.*  at 6–7;

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14; *see* R. 17, 21–22. Pittard asserts that under these circumstances, where the distinction between light and sedentary is "outcome-determinative," remand is necessary to require the ALJ to make findings as to whether the light occupational base was "significantly reduced." ECF No. 15 at 9.

Light work requires "frequent lifting or carrying of objects weighing up to 10 pounds . . . a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls," and a claimant who is capable of light work "must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b); Social Security Rule ("SSR") 83-10, 1983 WL 31251 (S.S.A.). Further, "[t]he major difference between sedentary and light work is that most light jobs—particularly those at the unskilled level of complexity—require a person to be standing or walking most of the workday." SSR 83-14, 1983 WL 31253, at *4 (S.S.A.).

The ALJ found that Pittard met her burden of proving that she had not engaged in substantial gainful activity since her alleged onset date, and she had severe impairments that prevented her from past relevant work, though the impairments did not equal a condition contained within the SSA's official listing of impairments. R. 15–17. The burden then shifted to the Commissioner to produce evidence that the national economy contained other jobs the claimant could perform considering her age, education, and work experience. *Hines v. Barnhart*, 453 F.3d 559, 567 (4th Cir. 2006); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(a)(4)(v). One way in which the Commissioner could meet this burden at step five of the sequential analysis is by relying upon the Medical-Vocational Guidelines ("the grids"). 20 C.F.R. Pt. 404, Subpt. P, App. 2. The grids take into consideration a plaintiff's physical abilities, age, education, and work experience, and direct a finding of disability or lack

of disability, depending on a combination of these factors. *Id.* If a claimant has impairments not contemplated in the grids, like nonexertional impairments, the grid is not dispositive, but provides a framework for the ALJ's decision. *Wilson v. Heckler*, 743 F.2d 218, 222 (4th Cir. 1984). In these cases, testimony from a vocational expert is required. *McLain v. Schweiker*, 715 F.2d 866, 870 n.1 (4th Cir. 1983).[6]

The Social Security Regulations further provide that the grid rules cannot direct a conclusion of disabled or not disabled when a claimant's exertional limitations fall between exertional levels. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(d); SSR 83-12, 1983 WL 31253, at *2. The regulations advise that when a claimant's exertional level falls between two rules that direct opposite conclusions of disabled or not disabled:

> a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."
>
> b. On the other hand, if the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify a finding of "Disabled."
>
> c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, [vocational specialist] assistance is advisable for these types of cases.

_____

[6] When a claimant suffers only exertional impairments, the grids are dispositive of whether the claimant is disabled. *Gory v. Schweiker,* 712 F.2d 929, 930 (4th Cir. 1983). However, if a claimant suffers from non-exertional impairments or a combination of exertional and non-exertional impairments, the Commissioner must prove through vocational expert testimony that jobs exist in the national economy that the claimant can perform. *See Walker v. Bowen,* 889 F.2d 47, 49–50 (4th Cir. 1989); 20 C.F.R. § 404.1569a. A nonexertional impairment is a "limitation that is present whether a claimant is attempting to perform the physical requirements of the job or not." *Gory,* 712 F.2d at 930.

SSR 83-12, 1983 WL 31253, at *3; *see also Golini v. Astrue*, 483 F. App'x 806, 807–08 (4th Cir. 2012) (holding that where the claimant's RFC falls between two exertional levels, the grid rules do not direct a finding, and it is appropriate for the ALJ to rely on the testimony of a vocational expert).

After determining that Pittard apparently fell between the grid rules, the ALJ complied with the regulations and elicited the testimony of a vocational expert. R. 52-53. VE Stromberg testified that the jobs of general information clerk, office helper, and cashier were available nationally in significant numbers for a person with Pittard's age, education, and past work experience, who was capable of light work, with the limitations outlined in the ALJ's RFC, including limiting walking and standing to four hours with an option to alternate sitting and standing at least each thirty minutes. *Id.* The ALJ relied on this opinion in his decision, where he stated:

> the claimant's ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the [ALJ] asked the vocational expert, Ms. Robin Stromberg, whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and [RFC]. Ms. Stromberg testified that given all of these factors the individual would be able to perform the requirements of representative light, unskilled occupations such as a general information clerk, . . . with 86,000 jobs in existence in the national economy; an office helper . . . with 200,000 jobs in existence in the national economy; and a cashier . . . with 1,000,000 jobs in existence in the national economy.

R. 22–23. The ALJ correctly relied upon the opinion of a vocational expert to determine that jobs exist in the national economy for someone with Pittard's limitations. R. 23; *See Hence v. Astrue*, No. 4:12cv1, 2012 WL 6691573, at *9 (E.D. Va. Nov. 30, 2012), *report and recommendation adopted,* 2012 WL 6697109 (E.D. Va. Dec. 21, 2012) (affirming a finding of

not disabled where the RFC limited claimant to "about two hours" of standing and/or walking each workday, placing him between the light and sedentary exertional levels, and the ALJ elicited the testimony of a vocational expert who credibly testified that light work jobs existed in significant numbers that a person with the claimant's limitations could perform); *Jones v. Comm'r, Soc. Sec. Admin.*, No. CV SAG-16-936, 2017 WL 627383, at *2 (D. Md. Feb. 15, 2017) (affirming decision where "the ALJ sought VE assistance, and obtained testimony that there were light jobs allowing the worker to sit for six hours during an eight hour workday," therefore "[t]he restriction to approximately two hours of standing or walking rendered [the claimant] capable not only of sedentary work, but of a reduced range of light work that would permit her to sit for the majority of the time") (collecting cases).

Pittard cites the Social Security Administration's Program Operations Manual System ("POMS") DI 25025.015(D) in support of her argument that the ALJ must "always" explain the basis for determining which exertional level most closely approximates the claimant's RFC. *See* ECF No. 15 at 7; ECF No. 18 at 1–2. [7]  POMS DI 25025.015 provides guidance to ALJs when a claimant's exertional capacity falls between exertional levels that dictate different conclusions as to disability, which is substantially similar to SSR 83-12 quoted above, with the notation that the ALJ should "[a]lways explain the basis of [the] conclusion." POMS DI 25025.015 (effective

---

[7] Pittard also references POMS 25015.006, ECF No. 15 at 8, which has an effective date of July 6, 2017, after the ALJ's decision in this case.   https://secure.ssa.gov/poms.nsf/lnx/0425015006 (last visited June 8, 2018).

March 27, 2015), https://secure.ssa.gov/poms.nsf/lnx/0425025015 (last visited June 8, 2018).[8] The regulations and guidance allow the ALJ to make a finding based on the grid rules of not disabled where a claimant has only slightly reduced capacity for light work or disabled where the claimant has a significantly reduced capacity for light work  *Id.* at *3; SSR 83-12, 1983 WL 31253. The POMS require the ALJ to provide a basis for the conclusion. POMS DI 25025.015. As discussed above, the regulations conclude by advising an ALJ to seek the assistance of a vocational specialist when the rules direct different conclusions and the exertional limitations fall somewhere "in the middle." SSR 83-12, 1983 WL 31253. To the extent the regulations and the POMS require the ALJ to explain the basis of the decision that Pittard is capable of work, and not entitled to a finding of disabled based on the grids, the ALJ did so here by explaining that Pittard was not capable of a full range of light work and that he relied on the VE testimony to determine that, even considering the unskilled light occupational base eroded by Pittard's limitations, significant jobs exist. R. 22–23. The ALJ then included in his decision samples of jobs available nationally that Pittard could perform with the limitations noted in his RFC. *Id.*

---

[8] POMS DI 25025.015 provides:

Determining whether a claimant is disabled is a more difficult judgment when his or her exertional capacity falls in the middle of two rules and the rules direct opposite conclusions. In this situation apply the:
- higher-numbered rule and find the claimant not disabled if you conclude the claimant has a slightly reduced capacity for the higher level of exertion; or
- lower-numbered rule and find the claimant disabled if you conclude the claimant has a significantly reduced capacity for the higher level of exertion.. . . .

IMPORTANT:        Always        explain        the        basis        of        your        conclusions. If necessary, use the assistance of a Vocational Specialist to determine which rule most closely approximates the claimant's RFC and vocational factors of age, education, and past work experience.

25

The case law and regulations require nothing more, and Pittard's motion to remand to require the ALJ to explain which exertional level most closely approximates her RFC should be DENIED.

**B.**    *Pittard does not present a borderline age case.*

Pittard asserts that the ALJ erred by not considering that Pittard presented a borderline age situation because she was slightly more than six months shy of her 55th birthday on the date of the ALJ's decision. ECF No. 15 at 9–13. For this reason, Pittard asks that the case be remanded for consideration of whether the older age category (applicable to claimants 55–59 years old) should be applied. *Id.* at 13. The Commissioner argues that "there was no borderline age situation" "[b]ecause the ALJ did not use the grid rules to conclusively establish disability." ECF No. 17 at 16.    While disagreeing with the Commissioner's argument, the Court recommends finding that it was not necessary for the ALJ to consider the higher age category (55–59) in this case because Pittard was more than six months away from reaching the higher age category at the time of the ALJ's decision.

Specifically, 20 C.F.R. § 404.1563 breaks age into four categories:    (1) closely approaching retirement age (60–64); (2) advanced age (55–59); (3) closely approaching advanced age (50–54); and (4) younger individual (18–49). Where someone is on the border of a higher age category, these categories are not to be mechanically applied. *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983); 20 C.F.R. § 404.1563(b). That is, if an individual is "within a few days to a few months of reaching an older age category, and using the older category would result in a determination or decision that [the individual] is disabled, [the Commissioner] will consider whether to use the older category

26

after evaluating the overall impact of all the factors of [an individual's] case." 20 C.F.R. § 404.1563(b).

The circuits are split as to whether the ALJ is required to make express findings in every borderline age case, with the Third, Eighth, and Tenth Circuits requiring express findings, and the Sixth, Ninth, and Eleventh Circuits not requiring express findings. *Compare Phillips v. Astrue*, 671 F.3d 699, 707 (8th Cir. 2012) (requiring findings regarding borderline age where claimant was four months shy of 55 years old); *Lucas v. Barnhart*, 184 F. App'x 204, 207–08 (3d Cir. 2006) (same where claimant lost insured status 3 ½ months shy of 55th birthday, at which time the ALJ found him disabled based on the grids); *Daniels v. Apfel*, 154 F.3d 1129, 1131, 1136 (10th Cir. 1998) (same where claimant was 65 days short of age 55); *with Caudill v. Comm'r of Social Security*, 424 F. App'x 510, 516–17 (6th Cir. 2011) (although claimant was within 2 months of age 55 at the time of the ALJ's decision, placing him in a borderline situation, the court found no *per se* requirement to address borderline age categorization in every borderline case); *Lockwood v. Comm'r Social Security Admin.*, 616 F.3d 1068, 1071–72 (9th Cir. 2010) (holding that the SSA's policy manual "does not impose judicially enforceable duties on [] the ALJ," and it was not necessary to make express findings regarding borderline age where claimant was "just shy of her 55th birthday"); *Miller v. Comm'r of Social Security*, 241 F. App'x 631, 635–36 (11th Cir. 2007) (finding ALJ committed harmless error to the extent he partially relied on the grids where claimant was two months shy of 55 at the time of the ALJ's decision).

While the Fourth Circuit has not addressed this issue, district courts in the Fourth Circuit have required express findings in borderline age cases where the claimant was between three and six months away from a higher age category. *See Pickett v. Astrue*, 895 F. Supp. 2d 720, 724

(E.D. Va. 2012) (requiring express findings where claimant was less than four months away from the higher age category); *Campbell v. Colvin*, No. 1:15cv165, 2015 WL 8484457, at *3 (M.D.N.C. Dec. 9, 2015) (same where claimant was not quite six months away from higher age category); *Fennell v. Berryhill*, No. 7:16cv312-FL, 2017 WL 4230557, at *3–4 (E.D.N.C. Aug. 31, 2017), *report and recommendation adopted*, No. 7:16cv312-FL, 2017 WL 4226039 (E.D.N.C. Sept. 22, 2017) (same where claimant was four months shy of age 50 on the date of decision); *Arnett v. Berryhill*, No. 1:16cv161, 2017 WL 1659060, at *4 (W.D.N.C. Apr. 4, 2017), *report and recommendation adopted*, No. 1:16cv161, 2017 WL 1552334 (W.D.N.C. Apr. 27, 2017) (same where claimant was approximately three months from turning age 50).

Moreover, courts have routinely found claimants within six months of the next age category to present a borderline age situation, while claimants more than six months away from the next age category do not. *See Ash v. Colvin*, No. 2:13cv47, 2014 WL 1806771, at *8 (N.D. W. Va. May 7, 2014) (adopting report and recommendation) ("generally, claimants who are within six months from the next age category are routinely considered borderline"); *Byes v. Astrue*, 687 F.3d 913, 918 (8th Cir. 2012) (eight months from next age category is too distant to be borderline); *Bush v. Astrue*, No. 5:06-00766, 2008 WL 867941, at *5–6 (S.D.W.Va. Mar. 28, 2008) ("it appears that Claimants are in a borderline situation when they are about six months from an older age category") (collecting cases); *Crook v. Barnhart*, 244 F. Supp. 2d 1281, 1283 (N.D. Ala. 2003) (adopting "[l]anguage from Appeals Council Interpretation II–5–302 (effective March 16, 1979) which "states that '[g]enerally, establishing an onset date up to six months prior to attainment of the specified age would be reasonable'"); *Barrett v. Apfel,* 40 F. Supp. 2d 31, 39 (D. Mass. 1999) (collecting cases holding that up to six months away from next age category can

28

qualify as borderline); *Lambert v. Chater,* 96 F.3d 469, 470 (10th Cir. 1996) (seven months away from next category does not present borderline age situation); *Underwood v. Bowen,* 828 F.2d 1081, 1082 (5th Cir. 1987) (ten months away from next category does not present borderline age situation).[9]

Plaintiff argues that a borderline age situation exists in this case, where application of the advanced age category (ages 55–59) to Pittard would have resulted in a finding of disabled.[10] ECF No. 15 at 9–13. Grid Rule 202.06 states that a 55–59 year old individual is disabled if the individual: (1) can no longer perform vocationally relevant past work; (2) has a high school education or more, but whose skills do not provide for direct entry into skilled work; (3) is skilled or semi-skilled, but the skills are not transferrable; and, (4) has a maximum sustained work capability limited to light work. 20 C.F.R. Pt. 404, Subpt. P, App. 2. The ALJ found Pittard was unable to perform any past relevant work, and could perform less than a full range of light work. R. 17–21. Consequently, had the ALJ considered Pittard's age as "advanced" (55–

---

[9] The Court notes that, on March 26, 2016, after the ALJ's decision, the SSA added provisions to the Hearings, Appeals, and Litigation Law Manual (HALLEX) to clarify the approach to borderline age cases, offering the following guidance:

*If a claimant is within a few days to a few months of reaching an older age category* (hereinafter "higher age category"), *and using the higher age category would result in a determination or decision that the claimant is disabled, SSA will consider whether to use the higher age category after evaluating the overall impact of all the factors of the case.*

. . . .

Generally, *SSA considers a few days to a few months to mean a period not to exceed six months.*

HALLEX I-2-2-42, 2016 WL 1167001, at *1 (Mar. 26, 2016) (emphasis added).

[10] Pittard met the insured status requirements of the Act through December 31, 2016. R. 15. Accordingly, the date of the ALJ's decision, July 14, 2015, is the appropriate date to consider when determining Pittard's age category. *See Woods v. Colvin*, 218 F. Supp. 3d 204, 208 (W.D.N.Y. 2016).

59), as opposed to "closely approaching advanced" (50–54), the grids would have dictated a finding of disabled.   20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.06.

In his opinion, the ALJ noted Pittard's date of birth, and that she was 50 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date. R. 21. The ALJ then found that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." R. 22. Lastly, the ALJ found that based on the record, including the testimony of the vocational expert, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 22. The ALJ did not include any borderline age analysis in the opinion.

The Commissioner asserts "[p]laintiff's argument regarding the borderline age situation is irrelevant because the ALJ did not use the grid rules to determine whether Plaintiff was or was not disabled. . . . Rather, he appropriately relied upon the VE's testimony and looked to the grids as a 'framework' in making his decision." ECF No. 17 at 15. Presumably, the Commissioner is arguing that, because Pittard suffers from both exertional and non-exertional impairments, the grids cannot be applied. This would suggest that an ALJ need never consider a borderline age situation in cases where a claimant has non-exertional impairments and a vocational expert is consulted.   The Court does not find this argument persuasive.   Where the grids indicate an individual's exertional limitations lead to a finding of disabled, the presence of non-exertional limitations does not alter this finding. *See Woody v. Barnhart*, No. 6:05cv45, 2006 WL

2349939, at *3–4 (W.D. Va. Aug. 14, 2006).   Thus, the ALJ would need to address the borderline age issue if Pittard presented a borderline age case even though a VE was consulted.

Here, the ALJ erred in considering Pittard's age on the alleged disability onset date, R. 21, as opposed to the date of the ALJ's decision. *Woods*, 218 F. Supp. 3d at 208.   That error was harmless, however, because Pittard was more than six months away from the next age category at the time of the ALJ's decision, and did not present a borderline age situation.   Therefore, Pittard's motion for remand to require the ALJ to address borderline age should be DENIED.

## C.   *The ALJ properly evaluated the medical opinion evidence.*

In her third claim of error, Pittard argues that the ALJ erred in failing to properly evaluate the medical opinion evidence and adhere to the treating physician rule.   ECF No. 15 at 13–22. Specifically, Pittard argues that the ALJ erred in failing to provide good, specific, and supported reasons for rejecting the opinion of Pittard's treating physician, Dr. Feldman.   *Id.*

The regulations provide that, after step three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC.   20 C.F.R. § 404.1545(a).   The RFC is a claimant's maximum ability to work despite her limitations.   *Id.* at § 404.1545(a)(1).   The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work.   *Id.* at § 404.1545(a)(5).   The determination of RFC is based upon a consideration of all the relevant medical and other evidence in the record.   *Id.* at § 404.1545(a)(3).[11]

---

[11] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work.   20 C.F.R. § 404.1529(a).

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions[12] of treating providers.  For claims like Pittard's, filed before March 27, 2017,[13] a treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see also Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017).  Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.  However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 1996 WL 374188, at *4 (S.S.A.).

When an ALJ assigns other than controlling weight to a treating provider's opinion, it is

---

[12] "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your . . . impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." 20 C.F.R. § 404.1527(a)(1). An "acceptable medical source" includes a licensed physician or psychologist, but not a licensed counselor. 20 C.F.R. § 404.1502(a). Evidence from medical sources other than an acceptable medical source, such as a licensed therapist, will be considered to show the severity of the individual's impairments and how they affect the ability to function. SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A.); 20 C.F.R. § 404.1502(d) (defining a "medical source" to include one who is state licensed and engaged in a scope of practice authorized by federal or state law).

[13] On January 18, 2017, SSA promulgated a final rule that revised its medical evidence rules, including the treating physician rule, and specified that the revisions apply to claims filed on or after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017).

"still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *4. The main factors are: (1) the examining relationship, giving more weight to sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527(c) (also noting ALJ's obligation to "give good reasons . . . for the weight" given to a treating source opinion); *see Brown v. Comm'r of Soc. Sec.,* 873 F.3d 251, 256 (4th Cir. 2017) (noting that the first two factors are "specific to treating sources," while the latter three apply to evaluating medical opinions from both treating and non-treating sources).

By regulation, the ALJ must also explain the weight assigned to *all* opinions, including treating sources, non-treating sources, state agency consultants, and other non-examining sources. 20 C.F.R. § 404.1527. Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. This specificity requirement is necessary because a reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

### 1. Substantial evidence supports the ALJ's assignment of minimal weight to Dr. Feldman's opinions.

The ALJ appropriately considered all opinions in the record, specified the weight accorded to each, and explained the reasons for assigning that weight. R. 20–21. Prior to addressing the opinion evidence, the ALJ summarized Pittard's testimony, Sentara treatment notes, therapy notes, Dr. Feldman's treatment notes, consultative psychological and physical examination findings, and x-ray results. R. 18–21. Next, the ALJ assigned moderate weight to the opinion of the consultative psychological examiner, Dr. Shea, great weight to the consultative physical examiner, Dr. Dulai, minimal weight to the physical and mental assessments of Dr. Feldman, and significant weight to the state agency consultants' assessments. R. 20–21. The ALJ explained that he assigned Dr. Feldman's physical and mental assessments "minimal weight" because:

> they are not consistent with the mild to moderate findings on physical and mental status examinations, the conservative level of treatment, or [Pittard's] activities of daily living. The limitations noted by Dr. Feldman appear to be based on the claimant's subjective complaints, which are only partially credible.

R. 21.

In arguing that the ALJ did not provide good reasons for giving Dr. Feldman's opinions less than controlling weight, Pittard attacks the reasons listed by the ALJ. ECF No. 15 at 18–21. First, Pittard attacks the ALJ's decision to discount Dr. Feldman's assessments because they are based on Pittard's subjective complaints, asserting that it is proper for a physician to rely on a patient's subjective reports. *Id.* at 18 (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1200

34

(9th Cir. 2008)).  Dr. Feldman opined on Pittard's mental and physical RFC in April 2015, after

treating Pittard on five occasions:  August 28, 2012, June 11, 2013, March 6, 2014, March 31,

2015, and the day of the assessments, April 8, 2015.  R. 368, 370, 388, 392, 408, 412, 414.  The

treatment notes are comprised largely of a discussion of Pittard's history, current medications,

and routine screenings that need to be performed, such as pap smears, mammograms, and a

colonoscopy.  *Id.*  There is some discussion of Pittard's symptoms, and scarce notations

regarding any objective findings following Dr. Feldman's examinations.  *Id.*  Only two of Dr.

Feldman's treatment notes, August 2012 and June 2013, contain notations under the physical

examination section to indicate an examination was conducted.  R. 368, 370, 392.  An x-ray

taken March 11, 2013 revealed pronounced scoliosis, marked spondylosis, and probable

multilevel disc degeneration.  R. 375.[14]

In his mental RFC assessment, Dr. Feldman checked boxes to indicate that Pittard was

extremely impaired in two areas, markedly impaired in two areas, and moderately impaired in

five areas.  R. 404–05.  Dr. Feldman's treatment notes include few, if any, objective observations

with respect to Pittard's mental status.  In August 2012, he indicated that Pittard's mood,

memory, and judgment were "OK."  R. 370.  His treatment notes also reflect Pittard's report of

suffering from depression for two years (R. 368), that her depression is chronic (R. 414), and her

report of anxiety (R. 388).[15]

---

[14] Dr. Feldman did have blood and urine screens administered on June 11, 2013 and March 31, 2015.  R. 389–91, 409–11.  Dr. Feldman also had three electrocardiography tests ("ECGs") performed in 2012, 2013 and 2014, with a borderline result in 2012 and normal findings in 2013 and 2014.  R. 367, 413, 415.

[15] Dr. Feldman made some additional notes during Pittard's two appointments that took place after he completed his assessments.  On April 27, 2015, Dr. Feldman noted that Pittard felt down

In his physical RFC assessment, Dr. Feldman opined that Pittard could walk less than a block without rest, could sit for ten minutes before needing to get up, could not stand still, needed to move every five to ten minutes, could rarely lift ten pounds or climb stairs, could occasionally raise arms above her shoulders, and could never lift twenty pounds, twist, stoop, bend, crouch, and climb ladders. R. 398, 400. The minimal objective examination findings in Dr. Feldman's treatment notes do not support these opinions. R. 368, 370, 388, 392, 406–08, 412, 414. Dr. Feldman noted that Pittard has scoliosis, and had undergone a fusion surgery. R. 368. There are notations that Pittard complained of back pain or shoulder pain during four appointments, two of which took place after the assessments were completed. R. 368, 388, 412, 414. She also complained on one occasion of an inability to lift (R. 388), and she reported that she could only sit for 12 to 15 minutes on one occasion after Dr. Feldman's assessment, (R. 412). The x-ray results support a finding of some limitation due to Pittard's scoliosis, but Dr. Feldman does not comment on the x-ray results in his treatment notes or discuss any physical examination results indicating the extent of those limitations.

Due to the scarcity of treatment notes discussing objective findings regarding Pittard's mental and physical impairments, the ALJ's conclusion that Dr. Feldman's mental and physical RFC assessments appear to be largely based on Pittard's report of her symptoms is supported by the record. As a result, the ALJ did not commit error in discounting Dr. Feldman's opinions on this basis. *See Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at \*3 (E.D. Va. Apr. 2, 2015) (finding that ALJ correctly discounted a physician's diagnosis supported "with nothing

---

all of the time, that there was no worsening of her mood on medication, and that she was not suicidal. R. 407. On May 26, 2015, Dr. Feldman noted Pittard's report that medications were starting to help and her mood was improving somewhat. R. 406.

more than a Plaintiff's subjective claims").

Next, Pittard argues that Dr. Feldman's opinions are consistent with the opinions of Dr. Shea and Dr. Dulai, the consultative examiners, and that it was error for the ALJ to consider these opinions in isolation "without considering the fact that these sources independently arrived at virtually similar conclusions." *Id.* at 18–19 (citing 20 C.F.R. § 416.927(c)(4) (the ALJ must consider the consistency of medical opinion evidence with the record as a whole including the consistency of medical opinions)). The ALJ did consider all of the medical opinions and discounted Dr. Feldman's opinions, in part, because they were inconsistent with the "mild to moderate findings on physical and mental status examinations [and] the conservative level of treatment." R. 21. The ALJ discussed the findings and treatment, which provide substantial evidence to support the ALJ's decision to discount Dr. Feldman's assessments.

Dr. Shea found Pittard was calm, adequately dressed and groomed, alert and oriented, with clear speech, average cognitive function, intact judgment and insight, and goal-directed responses to questions. R. 379. Pittard exhibited a depressed and anxious mood and affect, and Dr. Shea assigned a GAF of 55 to 60, indicating moderate functional difficulties. R. 379–80. Dr. Shea opined that Pittard's unstabilized psychiatric condition would impact her ability to attend work a full week, to work consistently, and to handle reasonable job stress. R. 380. In addition, her ability to interact with coworkers and the general public was going to be impacted by her social isolation. R. 380, 382.

The ALJ discussed Dr. Shea's consultative psychological exam, noting that while Pittard did not like going out or being around people, she had friends from an old neighborhood and her church, she spent time with others, she noted no problems getting along with others, and she

37

went shopping in stores. R. 16. The ALJ discussed Pittard's ability on examination to perform mental calculations and serial seven subtractions, as well as her report in November 2013 that she could pay attention for thirty minutes. R. 16–17. The ALJ noted that, although she reported not finishing what she started and having trouble following spoken instructions, Pittard also indicated she could follow written instructions well, and she performed activities that require concentration such as driving, watching television, paying bills, counting change, handling a savings account, and using a checkbook. R. 17.

Further, as noted by the ALJ, during Pittard's last examination with Sentara Family Physicians prior to her February 2011 alleged onset date, Pittard reported that she felt well overall, and her depression was gradually improving with Prozac. R. 18, 327. On May 14, 2011, Pittard reported that she felt very well and her mood symptoms were doing well off medication, her examination was normal with notations that she was negative for depression and not nervous or anxious. R. 18, 330.

The ALJ also relied upon therapy notes from Counselor Lawrence with Christian Psychotherapy Service who held 53 therapy sessions with Pittard from September 1, 2010 to August 7, 2012, and one additional session on March 18, 2014. R. 19, 335–65, 393–94. Counselor Lawrence assigned Pittard GAF scores between 64 and 72 during the relevant period, indicating mild symptoms. R. 19, 346–47, 349–51. Pittard relayed varying degrees of depression and anxiety throughout these sessions. The ALJ specifically addressed notes from Pittard's last therapy session, in March 2014. R. 20. Although Pittard reported that she was depressed and anxious and she exhibited a blunt affect, Counselor Lawrence noted that Pittard had normal attention, concentration and memory, bright intelligence, fair judgment, and normal

insight. R. 20, 393–94. Counselor Lawrence suggested that Pittard continue therapy and cease alcohol use. R. 394. Counselor Lawrence's notes support the ALJ's finding that Pittard's mental health treatment was conservative.

Pittard argues that Dr. Feldman's opinions were consistent with those of Dr. Dulai, citing that Dr. Dulai found that Pittard's gait was "somewhat antalgic" and she had difficulty doing a tandem gait. ECF No. 15 at 19; R. 384. After discussing Dr. Dulai's examination notes from March 2013, the ALJ assigned great weight to Dr. Dulai's opinion. R. 19–21. The ALJ noted Pittard's physical examination was normal with the exception of Dr. Dulai's notations regarding her gait. R. 19, 384. Pittard was not in distress, her lungs were clear, she exhibited normal tone and bulk, 5/5 strength in the upper extremities, "give-way weakness" in the lower extremities, and normal strength in the lower extremities when full effort was given. R. 19, 384–85. Pittard had a decreased range of motion in her thoracolumbar spine, but a normal range of motion in all other joints. R. 20, 385–86. While her affect was blunted, she was alert and oriented and her attention span and concentration were intact. R. 19–20, 384–85. Dr. Dulai assessed that Pittard could stand and walk six hours in a workday with no limitations on sitting; had postural limitations due to her back pain, spinal fusion and mild gait instability; could lift ten pounds frequently and twenty pounds occasionally, and had a normal range of motion. R. 385–86.

While Dr. Feldman's findings may have been consistent with Dr. Dulai's to the extent that Dr. Dulai noted issues with Pittard's gait, the similarity ends there. The physical limitations assessed by Dr. Feldman (walking less than a block before needing to rest, sitting for ten minutes before needing to get up, rarely lifting ten pounds, and never lifting twenty pounds) are not consistent with Dr. Dulai's findings following a thorough examination from which a detailed

39

report was prepared. R. 398, 400. Pittard's argument that the opinions of Dr. Dulai and Dr. Feldman are consistent is not persuasive.

In addition, Dr. Feldman's physical assessment was not consistent with treatment notes from Sentara Family Physicians, dated February 26, 2010 through May 14, 2011. R. 296–302, 305–06, 308–309, 311–312, 314–27, 329–30. As summarized by the ALJ, on January 15, 2011, two weeks prior to Pittard's February 1, 2011 alleged onset date, Pittard reported that she felt well overall, had mild lower back pain that was tolerable, and her asthma was gradually improving. R. 18, 327. On May 14, 2011, Pittard felt very well and her examination was normal. R. 18, 330. The ALJ did not err in discounting Dr. Feldman's physical RFC for being inconsistent with Dr. Dulai's findings following a well-documented physical examination of Pittard, as well as treatment notes from Sentara Family Physicians.

Evidence in the record also supports the ALJ's discounting Dr. Feldman's opinion due to the conservative course of treatment Pittard received for her physical impairments. As noted by the ALJ, Pittard testified that she treated her back pain, which she rated at a five out of ten, with Tylenol. R. 18, 40, 43. There is no indication that Pittard sought more intensive medical treatment, including physical therapy, for her back.

Pittard next attacks the ALJ's conclusion that Dr. Feldman's opinion is inconsistent with Pittard's activities of daily living. ECF No. 15 at 20, R. 21. Pittard references her hearing testimony that she does not do housework, does not walk dogs, goes to stores "a few times a year," and does not get into the tub or shower when home alone. ECF No. 15 at 20; R. 38–39.

There are few contemporaneous reports of daily activities after August 2012, when

Pittard discontinued regularly attending therapy sessions due to her financial situation.[16] In September 2012, however, Pittard reported to the SSA that she mowed the lawn on a tractor for two hours two times each month, did two hours of laundry each week, performed light chores daily, drove a car, shopped for food and clothes two times a month for two to three hours, camped twice each year, rode a motorcycle, and spent time with others daily. R. 189–92. Pittard had one therapy session in March 2014, where she reported to Counselor Lawrence that, despite her functional limitations, she drove a few blocks daily. R. 393.

The ALJ discussed in his opinion that, in March 2013, Pittard reported to Dr. Shea that her activities of daily living including taking care of the dogs, doing laundry, and paying bills; in November 2013, she reported sometimes needing reminders to bathe, but had no other problems with personal care, and that she prepared simple meals, drove, went shopping in stores, took care of her dog, watched television, and played computer games; and in June 2015, she testified that she played cards, fed the dogs, dressed and bathed herself, and went shopping twice a year. R. 16. As noted by the ALJ, Pittard's activities of daily living are not consistent with Dr. Feldman's opinions regarding her physical and mental impairments.

For all of the reasons stated above, substantial evidence supports the ALJ's determination to assign Dr. Feldman's opinions minimal weight. Pittard's motion to remand due to the ALJ's failure to assign Dr. Feldman's opinions appropriate weight should be DENIED.

---

[16] Pittard reported fairly robust activities after her alleged disability onset date of February 1, 2011. In February 2011, Pittard quit work to care for her mother, which she continued to do until her mother's death in June 2011. R. 345–46, 351. Pittard explained to her therapist that she took care of her mother full time, including cleaning her mother's house. R. 351. In March 2011, Pittard started delivering papers, which she also continued through June 2011. R. 344, 349. In September 2011, Pittard reported that she was very busy doing yard work, and was nursing a cancer-surviving friend. R. 342. In May 2012, Pittard discussed that she may nurse her aunt while her aunt recovered from breaking her shoulder. R. 337.

2.  **The ALJ did not commit error in assigning significant weight to the opinions of the non-examining consultants who reviewed the record over one year prior to the ALJ's decision without requesting an additional review of the record prior to entering his opinion.**

Lastly, Pittard attacks the ALJ's decision to accord "significant weight" to the opinions of the state agency non-examining consultants, arguing that, while the opinions may have been reasonable at the time they were made, they opined about her condition over one year before the ALJ's decision, prior to full development of the record. ECF No. 15 at 21. Pittard asserts that the non-examining consultants reviewed the record in December 2013, over one year prior to the ALJ's decision in July 2015, and did not have access to a significant portion of the record, including Dr. Feldman's opinions, when their assessments were made. *Id.* Pittard does not assert "that the opinions of the Agency's reviewers were necessarily unreasonable *at the time they were made*," but argues that the ALJ should have re-contacted the medical experts or requested an additional review of the record prior to entering his decision. *Id.*

The nineteen-month lapse between the date that the state agency consultants reviewed Pittard's record and the date the ALJ relied on those assessments to render a decision does not necessitate a remand for additional development of the record.

> [B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). "Only where 'additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing,' is an update to the report required." *Id.* at 361 (citing SSR 96–6p,

42

1996 WL 374180 (S.S.A.) (emphasis added)).   Pittard does not contend that the additional evidence in the record accumulated after review by the agency consultants supports a finding that Pittard's impairments became severe enough to meet a Listing.

Pittard's argument that remand for further development of the record is required because over one year passed between the state agency consultants' opinions and the ALJ's decision is not persuasive.   *See Pauley v. Berryhill*, No. 3:16cv8943, 2017 WL 3474078, at *1, 9, 12 (S.D.W. Va. July 21, 2017), *report and recommendation adopted*, No. 3:16cv8943, 2017 WL 3470933 (S.D.W. Va. Aug. 11, 2017) (finding no error where the ALJ relied upon the June 2012 assessment of a non-examining state agency expert in a May 2014 decision without requesting updated opinions); *Rickabaugh v. Berryhill*, 271 F. Supp. 3d 721, 737 (D. Del. 2017) (finding no error where ALJ gave significant weight to the opinions of the non-examining state agency consultants who reviewed claimant's file over three years prior to the ALJ's decision); *Marchant v. Berryhill*, No. 17cv3025-CJW, 2017 WL 5175598, at *1, 4 (N.D. Iowa Nov. 8, 2017) (finding no error where ALJ relied heavily upon the opinions of the non-examining state agency consultants who reviewed claimant's file twenty-three months prior to the ALJ's decision).

By the time Drs. Jennings, Keeley, and Duckwall examined the record, Pittard's conditions were well-documented.   The doctors accurately identified and discussed Pittard's back pain, depression, and anxiety, the primary issues addressed by Dr. Feldman.   Having considered the state agency medical opinions in conjunction with later acquired information, the ALJ properly accounted for the same in determining Pittard's RFC.   *See O'Donnell ex rel. O'Donnell v. Comm'r of Soc. Sec.*, 113 F. App'x 475, 478 (3d Cir. 2004) (holding that the ALJ could rely upon the opinions of state agency physicians who did not have access to a report as

43

long as the ALJ considered the report, along with other evidence of record, in assessing RFC).

Accordingly, the ALJ committed no error in assigning "significant weight" to the administrative

findings of Drs. Jennings, Keeley, and Duckwall, the non-examining state agency consultants, R.

21, and was not required to obtain an additional review of the record prior to entering his

decision. Pittard's motion to remand for additional development of the record should be

DENIED.

### D.     *The ALJ was not required to specifically address Pittard's*
###        *work history when making his credibility determination.*

Pittard next asserts that the ALJ's credibility assessment is defective due to his failure to

sufficiently consider Pittard's work history. ECF No. 15 at 23–26. Pittard provides an

exhaustive list of cases in which district courts have found that an ALJ should take into account a

claimant's good work record when making a credibility determination. *Id.* at 24–25 n.6. None

of the cases is from a district court in the Fourth Circuit, which have not required a specific

discussion of work history when determining a claimant's credibility. *See Kaston v. Colvin*, No.

5:15cv539-FL, 2017 WL 327484, at *8 (E.D.N.C. Jan. 3, 2017) (holding the ALJ did not err by

failing to comment on the "nature and longevity" of the claimant's work in finding the claimant

"not fully credible"), *report and recommendation adopted*, No. 5:15cv539-FL, 2017 WL 325240

(E.D.N.C. Jan. 23, 2017), *appeal dismissed sub nom., Kaston v. Berryhill*, 697 F. App'x 256 (4th

Cir. 2017); *Brooks v. Colvin*, No. 1:12cv189-MU, 2013 WL 5302566, at *5 (W.D.N.C. Sept. 19,

2013) (stating the Fourth Circuit does not recognize an "enhanced credibility doctrine"

automatically assigning more weight to claimants with a strong work history); *Corley v. Colvin*,

No. CIV.A. 9:12-2676-TMC, 2014 WL 607706, at *4–5 (D.S.C. Feb. 18, 2014) (finding no error

where ALJ did not address claimant's "long and steady work history" when determining that

44

claimant's testimony was not entirely credible); *Jeffries v. Astrue*, No. 3:10cv1405, 2012 WL 314156, at *25 (S.D.W. Va. Feb. 1, 2012) (holding that a long work history does not alone establish a claimant's credibility); *Clark v. Astrue,* 3:12cv122–MOC, 2012 WL 6728441, at *3 (W.D.N.C. Dec. 28, 2012) (same).

In finding Pittard's allegations regarding the limiting effects of her symptoms were "only partially credible," the ALJ considered Pittard's subjective reports, in conjunction with the record as a whole. In assessing subjective statements, an ALJ must engage in the two-step inquiry detailed in 20 C.F.R. § 404.1529 by evaluating: (1) whether an underlying medically determinable impairment was established by objective medical evidence that could reasonably be expected to produce a claimant's symptoms, and (2) if so, the extent to which such symptoms limited a claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects. *See Lewis*, 858 F.3d at 865–66; *Craig*, 76 F.3d at 593–95. At the second step, an ALJ must "assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. § 404.1529(c)(4)). To evaluate the intensity and persistence of a claimant's symptoms, the ALJ must consider all the evidence, including the objective medical evidence, the claimant's daily activities, various facets of any asserted pain (including its intensity, location, and frequency), any events giving rise to symptoms, medical treatments and medications and their effectiveness, any other pain relief measures, and other factors about the claimant's functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c).

The ALJ discussed Pittard's history of back pain and fusion surgery at the age of 15, resulting in a decreased range of motion in her thoracolumbar spine and an antalgic gait. R. 20.

45

He noted that despite this, Pittard exhibited normal strength when full effort was elicited and managed her pain with over-the-counter medication. *Id.* The ALJ acknowledged Pittard's history of depression and anxiety resulting in GAF scores in the mild to moderate range, for which she received conservative treatment never requiring hospitalization. *Id.* Finally, the ALJ discussed Pittard's activities of daily living, including "taking care of her dog, driving, shopping, caring for her personal needs, watching television, and playing card games on her tablet device." *Id.* The ALJ reviewed Pittard's statements about her limitations and carefully compared them with the medical evidence, her daily activities, her medical and mental health treatment, consultative examination records, and other evidence. While not in the section where he addressed her credibility, the ALJ did note Pittard's past relevant work as a case manager and a floor nurse, and that she had earned sufficient coverage to remain insured through December 31, 2016. R. 15, 21. District courts in the Fourth Circuit have not required ALJs to assign particular credibility based on a claimant's work history. The ALJ was clearly aware of Pittard's work history, and substantial evidence supports the ALJ's determination that Pittard's allegations regarding the limiting effects of her symptoms were "only partially credible." Accordingly, Pittard's motion to remand to require the ALJ to specifically address her work history should be DENIED.

## VI. **RECOMMENDATION**

For the foregoing reasons, this Court **RECOMMENDS** that plaintiff's motion for summary judgment (ECF No. 14) be **DENIED** and the Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED**.

## VII. **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 8, 2018

47